Ladies and gentlemen, please rise. This court is now in session. Please be seated. Thank you. We will now call the first case of the afternoon. 321-0253, people of the state of Illinois, handled by Laura Byron v. Ricky Brownson, paneled by Mark Fisher. Counsel, you may proceed. Good afternoon, your honors. May it please the court, counsel. I'm Mark Fisher from the State Appellate Defender's Office, representing the defendant in this case, Ricky Brownson. Ricky was convicted in a bench trial of three counts of aggravated criminal sexual assault and two counts of criminal sexual assault, the judge finding that in 2012 and or 2013, he sexually molested each of his triplet half-sisters when they were 8 years old and he was either 15 or 16 years old. He received five mandatory consecutive terms, totaling 26 years imprisonment, which was the minimum available aggregate sentence. This was actually the second time Ricky was tried on these charges. He was first tried in a jury trial in November of 2014. He was convicted, sentenced, and appealed. Certainly, your honor, Justice Holdridge is familiar with that case, your honor. He was in the panel on that case, participated on the panel. The majority of the court, with Justice Holdridge dissenting, reversed, finding a violation of Supreme Court Rule 431B. And in order to do so, the majority of this court had to find first-prone plain error, that the evidence was closely balanced. Notably, the second trial, which was a bench trial, the judge who presided over that bench trial was different than the judge who presided over the jury trial. And it's also of importance that the attorneys who represented Ricky at the second trial had not represented him at his first trial. Now, four issues are raised in this appeal. The first issue, Ricky maintains he has not proved guilty of the charged offenses beyond a reasonable doubt. He therefore respectfully asks your honors in Issue 1 to reverse those convictions outright. Alternatively, in Issue 2, he seeks a remand for further proceedings because Trunsell was ineffective for failing to present evidence that would have undermined the prosecution's case, evidence on which the majority of this court in the first appeal relied to a degree in finding that the evidence at that first trial was closely balanced. In Issue 3, defendant seeks two other alternative forms of relief. One is a remand for the appointment of independent post-trial counsel to represent Ricky on his pro se allegations of ineffective assistance. Alternatively, in Issue 3, he seeks a remand for an adequate crinkle hearing. And finally, in Issue 4, he respectfully asks your honors to remand this cause for an evidentiary hearing on his trial attorney's post-trial motion, which was based in part on recantation statements made by the complaining witnesses, but the judge summarily dismissed or denied that motion without hearing new testimony from those witnesses. Now, in argument today, I'd like to focus on Issues 2 and 3, both involving ineffective assistance. Of course, if your honors have questions about one or both of the other issues, I'd be happy to address those as well. Now, at both trials, the trier of fact viewed a videotape of interviews conducted with the complaining witnesses at the Children's Advocacy Center. And in those interviews, the triplets told the interviewer that their older brother, half-brother Ricky, had sexually abused them. The trial of fact of both trials also heard live testimony from the triplets, but their live testimony did not corroborate their pretrial allegations. At the first trial, they testified that nothing happened, that Ricky had not committed any crimes against them. At the second trial, the prosecutors, apparently knowing that they would not corroborate the pretrial allegations, didn't specifically ask them, what happened or what did your brother do? Instead, the prosecutors asked questions like, do you recall some years ago when there was chaos and unrest in your household? Do you remember some years ago making statements about your brother and about your relationship with your brother or half-brother? And the girls answered those questions, no, we don't recall. Because the complainants did not corroborate the pretrial allegations at either trial, the key witness for the state at both trials was their older half-sister, Diamond. But Diamond testified that at some point late in 2012, she was at home. It was at some point at night. She was in the bedroom. She shared with her half-sister on it. When they heard strange noises coming from the triplet's bedroom next door, Diamond went outside to investigate, tried to open the door, found that it was locked. She then told on it, the door's locked. Why is the door locked? She claimed that on it said, oh, they always lock the door at night. And Ricky sleeps in that same bedroom. He shares that bedroom with the triplets. According to Diamond, the next day, she and on it asked the triplets, what were those strange noises we heard the night before? She claimed the triplets told them, her and her sister on it, that the noises were the result of Ricky sexually abusing one of them and that this had been an ongoing course of conduct by their brother, abusing all three of them over a period of time. Diamond claimed she urged the girls, tell our parents, Paul and Mary. She claimed they told the parents. The parents then held a family meeting that included the family's pastor, Ernest Topping, and at that meeting, allegations were made against Ricky. He initially denied them, but he then broke down, admitted them, and apologized. Now, at the first trial, the defense called several witnesses to the stand, most importantly the parents, Paul and Mary, the half-sister on it, and Pastor Topping. And at that first trial, all four witnesses denied having ever been present at any family meeting in which the triplets made allegations of abuse and in which Ricky admitted and apologized. All four witnesses denied that the girls had ever said to them that their brother had been abusing them. In addition, Annette contradicted Diamond's testimony about the incident, about hearing the noises coming from the girls' bedroom, about questioning the girls the next day and about the girls the next day, telling Diamond and Annette that this is why those noises were being made. Annette said none of that ever happened. And finally, Pastor Topping testified, number one, that in addition to not ever being present at any such family meeting, he also testified that Diamond and Ricky didn't get along. In his words, they fought like cats and dogs. And he also testified that after the allegations came to light, he talked to Ricky. And he said, did this happen? What happened? He claimed that Ricky denied the allegations. Based on this testimony and on the testimony, of course, the evidence presented by the prosecution, the majority of this court, again, with your honor dissenting, but the majority of the court stated that at the first trial, the jury heard wildly divergent testimony about what did or didn't happen. And that the testimony of these witnesses discredited Diamond's testimony. Now, in this case, speaking of the first trial, as in most cases involving a 431B violation, the issue was not preserved in the trial court during the first trial, was not objected to. And therefore, in order to reverse and remand on that ground, this court had to find plain error. In addition, as your honors know, the Illinois Supreme Court has held that a 431B violation cannot be second-pronged plain error, only first-pronged, which requires closely balanced evidence. And that is the reason the majority of the court reversed and remanded the first time around. Unaccountably, none of this testimony, none of this evidence, was presented by Ricky's new attorneys at the second trial. Now, it's apparent that the attorneys found it important to at least attempt to impeach Diamond, because Diamond testified that at some point after these allegations came to light, she was involved in physical altercation at a home one night with her father and brother. And she was questioned by defense counsel. Well, after that happened, was the family pastor called to the house? She said no. She was asked by the-I'm sorry. She said no. The only evidence presented by the defense at the second trial was a stipulation that a police officer would testify that at some point he questioned Diamond and asked her, okay, after this incident with your father and brother, did you call the pastor to the house? And that her answer was yes, I did. In closing argument, the defense counsel twice referred to this impeachment testimony, saying this was a major inconsistency in Diamond's testimony. And for that reason, among others, the judge should acquit Ricky. In rebuttal closing argument, one of the prosecutors said, you know, okay, it's impeachment, but it's such minor impeachment and on such a collateral point that to say this contradicts the state's case is a ludicrous argument. Viewing the transcript of the first trial, it's abundantly clear that there is so much more that defense counsel could have done here to provide a defense to contradict the state's case. And Illinois case law is clear that where counsel is aware of evidence that would provide a defense that would contradict, tend to contradict the state's case, counsel's ineffective if he doesn't present that evidence. Furthermore, it's not like there was one theory presented by the defense at the first trial and a completely different theory presented at the second trial. Presenting these witnesses' testimony would have been in line with this impeachment testimony that they tried to present at trial number two. It would have been consistent. So seemingly absolutely no reason not to present this evidence. Mr. Kesher, do you know whether this defense attorney in the second case interviewed those witnesses? I have no knowledge. There's nothing in the record one way or the other. There was a mention during one of the pretrial proceedings, I believe, that defense counsel wanted a continuance to review the transcript of the first trial, whether they actually talked to those witnesses The record gives us no hope there whatsoever. It is for these reasons that Rickey submits that his attorneys provided ineffective assistance, and that is why he respectfully is asking Your Honors to reverse and remand for further proceedings in the event that you don't reverse outright as requested in Issue 1. Now, at the post-trial stage, Rickey made pro se claims that his attorneys were ineffective. One of those claims was they were ineffective because they did not call these witnesses that we've just been talking about. Another claim was that they were ineffective because they failed to present documentary evidence that they allegedly told Rickey before trial they were going to present. Now, the judge recognized there was a need to conduct a crankle hearing. She did conduct a hearing. It was not an adequate crankle hearing. Now, first, the defendant submits that, considering, again, the record of the first trial and considering these allegations, there wasn't even really a need for a crankle hearing. The judge should have just simply appointed independent counsel. Yes, decision about evidence to present or not to present is generally a question of trial strategy. Here, Rickey submits that the circumstances of this case really scream out neglect and not defensible trial strategy, and so the best course would have been simply to appoint independent post-trial counsel to investigate and, if need be, present these allegations, and that's one of the forms of relief Rickey is asking Your Honors for in the alternative in Issue 3. But in the alternative, certainly it remanded for a crankle hearing. At that hearing, unfortunately, the judge said and asked very little. She didn't say anything or ask any questions about the failure to call the witnesses. She did ask Rickey to clarify what he meant by documentary evidence. And I apologize. I see my time is almost up. I apologize. He said there were basically school records and the complainants didn't go into further detail. The judge asked no other questions, made no other statements, simply said you haven't given me enough to find a need to appoint counsel. There were many more questions she could and should have asked. For all of these reasons, I've stated the relief that Rickey is respectfully asking Your Honors to grant, and I thank you for your time today. Any questions? Thank you very much. Counsel, you may respond. Thank you. May it please the Court? Counsel? Laura Bilen on behalf of the people. Concerning Issue 1, defendant was proven guilty beyond a reasonable doubt of aggravated criminal sexual assault and sexual assault. The standard of review is what's critical here. It's whether any rational trier of fact could have found the offense proven. Viewing the evidence in the light most favorable to the prosecution, here the trial judge found that the victim's recorded statements were credible. She found they were overwhelming evidence of guilt, actually, and on appeal that credibility determination is entitled to deference. Moreover, the victim's recorded statements are very believable. They're in the record on appeal. This court can watch them for themselves and see how detailed these descriptions each girl describes the abuse, each in their own words as 9-year-olds, in great detail, very consistent with each other. They each described seeing the other sisters abused as well, so they each witnessed the abuse. And as some examples of the types of details that are in these recordings, Doe 1 stated that defendant put his private part in her private part and made it wet and it went all the way in. It felt squishy and uncomfortable. Sometimes he did it to her butt, and there would be lots of blood in the toilet, but only when he did it to her butt. Doe 2 described how defendant put his nuts in her noo-noo, saying it was really painful. It went inside. It hurt like pepper. It felt squishy and nasty. And she also described seeing him watch a bad movie with grownups with their clothes off touching each other. Doe 3 described defendant touching her with his private part on the skin in between on the inside. It hurt. It felt like pain. It was big and hurt a lot. It was hard. It felt wet with the wetness coming from Ricky. She also described how he spit on it so no blood would come. She said there had been blood she saw in the toilet before he would spit on it, but not after he spit on it. And at the end of her interview she says, I'm free, and she says she feels safe because defendant's in Boston and she never has to see him again. So that's the evidence, just highlights of what's in the recordings, in addition to the substantively admissible statements of Diamond, the sister, and there's substantively admitted statements to a doctor that two of the girls made, plus there's evidence of defendant's consciousness of guilt. All three girls testified at the second trial that defendant had lived with them when he came to America. In evidence then was a statement that defendant gave to a detective claiming he never even lived in the same house as his sisters, but that false exculpatory statement is probative of consciousness of guilt, given their testimony that he did live with them. There's also evidence that defendant had been sent to Boston after the allegations came out and it seems a reasonable inference is because of what he did to his sister. There's no evidence that Diamond was the reason that Ricky was sent to Boston, and that wouldn't make sense. She testified in the second trial, the only evidence was that their relationship soured after the sexual abuse occurred, and moreover, if Diamond was the one causing the issues, then wouldn't she be the one sent to Boston? In any event, reasonable inference is that the sexual abuse is how the family decided to deal with that situation. Concerning the second issue, counsel's ineffectiveness, counsel was not ineffective for not calling the witnesses from the first trial. Whether to call certain witnesses or what theory of defense to pursue are generally matters of trial strategy unless there are meaningful and effective assistance of counsel claims unless there's no meaningful adversarial testing that occurs, that counsel's strategy is so unsound that meaningful adversarial testing is missing. Defendant doesn't dispute that meaningful adversarial testing occurred in this case. In fact, counsel on appeal makes these same arguments in issue one of the brief that the evidence was insufficient to prove his guilt, that are the exact same arguments that were made in the trial court, so there is a strategy that is pursued. So where that is the case, the Nesbitt case is instructive, cited in the People's Briefest Court from 2016, it rejected a claim that counsel was ineffective for not calling a certain witness where defendant did not even argue that no meaningful adversarial testing occurred. Moreover, defendant argues that not calling these witnesses could not possibly have been strategic, but the record shows otherwise. The record reflects that trial counsel stated that reviewing the transcripts in the first trial was essential to their trial preparation, and they did get a continuance to review them. So having reviewed the first trial transcripts, there's not abstract risk with calling any witnesses. There were specific known risks with calling these witnesses. These witnesses were inconsistent with themselves, they were inconsistent with each other, and they had been impeached about many significant issues. For example, the father had been seen taking the three child victims to court in the original trial proceedings on a day that they were not required to be there, that the mom testified she thought they were going to a doctor's appointment, but the father took them there, took them to the first row, they sat there facing their brother, who was going to be on trial, they cried, they were crying in the courtroom, instead of comforting the girls, the father took them outside of the hallway and scolded them, just they continued crying and he said, this is what happens when you talk to others without talking to me first. Moreover, there's evidence that the father had told DCFS that defendant told him he did do it, and that defendant put his head down and busted up crying. The father had told DCFS that he believed defendant did it because the girls would not lie. The father had told a detective that defendant lived with the family. He contradicted himself as to when he learned of the allegations, and a victim had also testified in the first trial that a detective, she told a detective that her father had repeatedly, I think the detective testified, not the victim, but the detective testified that the victim said her father repeatedly told her on his weekend visits with her that it was her job to free defendant. The pastor's testimony was wildly inconsistent on when and how he learned about the allegations. He claimed to have been swarmed by eight police officers when he was at a soccer game and something about he had a lost wallet and that's why they were approaching him, but then he just really couldn't keep track of when he learned of the allegations and how. A detective testified that he talked to the pastor with one other officer present, never mentioned anything about losing his wallet, can you help me find my wallet, none of that. And the recorded interviews, one of the victims mentions the pastor, telling the pastor about it, and at the first trial in her testimony, had described that the pastor did come to the house for a meeting. So the mother had also told a detective that defendant did live with them. So in light of all these known serious impeachment and inconsistencies, it was a strategic call on behalf of defense counsel for the second trial, whether to call these witnesses or not. Now the court in the first appeal had found that the evidence was closely balanced. That doesn't mean that looking at the transcripts of how these witnesses testified, that defense counsel would look at these witnesses and think, yeah, those would make great witnesses, this is really going to help my case. Instead, counsel could reasonably conclude that as the jury had not believed the witnesses and the dissenting justice found those witnesses' testimony was not really useful, that it wasn't going to be a helpful strategy to put on these witnesses who, in putting them on and they're found not credible, they just present the risk of explaining why the girls would claim not to remember anything. There's the risk of showing further the pressure the girls faced from their father to exonerate their brother. And there's the risk of creating sympathy for the victims. My question is, how do you know that that's what defense counsel was thinking? There isn't anything in the record that says we didn't call these witnesses because of A, B, and C. You're just speculating, aren't you? So it is true that there was not a, this does relate to the crinkle issue, where there wasn't the hearing on counsel being questioned as to why you did not present these witnesses. However, the people's position is that the record is so clear that what the trial strategy would have been, in light of the fact that defendants not contending that no meaningful adversarial testing occurred, that the strategy is obvious. In the alternative, should this court believe that further evidence is necessary, then every man for the crinkle inquiry would reveal more of those facts. At the very least on this record, it can't be concluded that trial counsel wasn't effective. Although the people's primary position is that the record clearly shows that not calling them was strategic in light of the adversarial testing that occurred. Concerning the crinkle issue, the crinkle issue has two parts. So he made two claims. One was this newly discovered evidence claim. That claim the trial judge did ask some questions about, and she learned that defendants said, oh, I need to see a transcript to see what he was talking about. It appeared that there were some school records that the state had subpoenaed that were obtained and turned over to defense counsel and would have been reviewed by them. So there was really not a failure to investigate that evidence that had been obtained. What do we know about the contents of the counseling records that the defendant claimed to be helpful to him? The school counseling records are not in the record, I believe. I think there's hospital records that were in the record that were obtained and are in the record on appeal. I don't believe there's anything from the school. I mean, I guess I should phrase my question better. I apologize. What did the judge in questioning the defendant learn about the contents of the records that the defendant claimed helped him? The trial judge learned that counsel had obtained and discussed the records. She learned that it was a matter of what he described it as by reference to the transcript. He didn't even know what evidence he was talking about, so he just said there was some evidence that they said they were going to get but then they didn't use. So that means that she learned that they did get the evidence, they just didn't use it. So when they had had it and not used it, that's a question of what evidence to present. Again, a matter of trial strategy in light of the judge's awareness of counsel's performance at trial. The second issue he raised concerning the witnesses, he had stated in one of his filings that the witnesses were these family witnesses from the first trial. And that issue now has, what's there to accomplish on a remand for Krenkel from that issue? That issue's now been fully addressed on appeal with defense counsel not arguing that anything else is necessary and the people's position being that the strategy is clear. Krenkel's purpose is to promote consideration in the trial courts of these types of issues and limit issues on appeal. That hasn't happened here, but at this point, there's no reason to have a Krenkel hearing on that second issue when it's been fully developed in this court. If there are no further questions, the people have asked that this court confirm defendant's conviction and sentence. No, there are none. Thank you, Your Honors. Counsel, you may reply. Thank you, Your Honor. In response, Your Honor, Justice Storting's question, what did the judge learn about the contents of those school or counseling records? The judge didn't learn anything. She did ask Ricky, what is this documentary evidence you're referring to? He said there were school records or counseling records pertaining to the triplets. One would have expected a follow-up question, okay, what was contained in those records? Why do you think they were important? She could have asked that of Ricky. She could have asked that of counsel. She didn't ask anything at all. She didn't really learn anything. Your Honor, Justice Hauptman earlier had asked me whether the record shows whether counsel had questioned these witnesses who had testified at the first trial, and as I said, the record doesn't help us answer that question one way or the other. That's something the judge could have explored in the crankle hearing for whatever reason decided not to. Very oddly, after the judge said to Ricky, you haven't given me enough to warrant the appointment of independent post-trial counsel, she then turned to trial defense counsel, and I'm paraphrasing here, but she said something like, well, I'm assuming you're not adopting his allegations. And, of course, I said no. You know, that's not the type of thing you would expect at a crankle hearing. This was not an adequate crankle hearing. Mr. Fisher, what's your response to the argument by the State about meaningful adversarial? Yes, so, and thank you, Your Honor. That was one thing I wanted to mention above here right now. I think it's frankly a bit of a quibble maybe between the State and myself. The State says they didn't make that argument. The defendant decided the Strickland standard conduct fell below reasonable, but the expected standard of reasonable conduct by counsel, given the circumstances of this case, the result at trial would have been different, likely would have been different. I think the two standards are somewhat equivalent. If they're not, I don't know of any case law that says, well, if the counsel, so to speak, fails the Strickland standard, well, that's still not enough for an effective assistance if there is an adversarial process, so the defendant relies on Strickland. I think I made it clear here that the representation of Ricky at the second trial was so lacking that counsel was ineffective. It fails the Strickland standard. If you want to apply the standard that the State applies, it fails that as well. Either way, counsel is ineffective here. And this is an unusual situation because this Court has the transcripts of the two trials and can compare and contrast. The State goes through some of the statements made during the CAC interviews. They clearly did accuse their older half-brother. There's no question about that. I think what the State omits is those statements were not entirely consistent. The State says, oh, the defense witnesses at the first trial, they gave inconsistent statements. The statements did not completely sync up the ones given at the Children's Advocacy Center. That's discussed in the briefs. There are inconsistencies between the three. I think the State would probably say, well, they were consistent in their claims then that she had been abusing them. The defense witnesses were consistent at the first trial on the major points, but there was no family meeting where Ricky was accused and admitted it. There were no claims made to them by the girls. Annette was very clear that this whole scenario that Diamond talked about, that never happened, certainly didn't happen in Annette's presence. The State talks about the pastor and the wallet. I mean, okay, on the major points they were consistent. And, again, I think this Court would recognize, and I don't want to put words in Your Honor's mouth, I suspect Your Honor might have agreed with the majority in the original panel that the first jury heard wildly divergent statements at that first trial about what happened. They were, therefore, presented with a legitimate choice. And that did not happen here because counsel failed to present that evidence. No, seemingly no logical reason why counsel would not have done so. I think, finally, I agree with Your Honor Justice Doherty's question of the State. I think a lot of what the State says here is speculation, speculating, well, they didn't call witnesses for this matter, the other reason. It's not in the record for all of these reasons. Ricky, respectfully ask for the altering of the forms that were set forth in the briefs. Thank you, counsel. Thank you, Your Honor. Thank you, counsel, both, for your arguments in this matter this afternoon. We will be taking under advisement in Rick's disposition.